**AMERICAN NURSING HOME ASSOCIATION, Plaintiff,**

v.

**The COST OF LIVING COUNCIL et al., Defendants.**

**Civ. A. No. 1773-73.**

United States District Court, District of Columbia.

Feb. 7, 1974.

Thomas C. Fox, Washington, D. C., for plaintiff.

James Elkins, Atty., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM

GASCH, District Judge.

This action concerns the continuing challenge by plaintiff to the Cost of Liv-ing Council regulatory scheme governing nursing homes.[1] On December 5, 1973, this Court granted plaintiff's requested relief and through the consolidation of the preliminary and final injunctive questions, permanently enjoined the enforcement of 6 C.F.R. § 300.18. D.C., 368 F.Supp. 490. The effect of this ruling was that defendants were enjoined from interfering with or limiting the amount of cost reimbursement which nursing homes are entitled to receive under the Medicare and Medicaid Programs.[2] Concomitant with this ruling, the Court found on the basis of the record that the strict regulation of the nursing home industry through the aforementioned regulations was unwarranted in the light of the minimal impact of nursing home care as an inflationary factor in the economy. Accordingly, these regulations were declared arbitrary and capricious.

The government moved for reconsideration and an opportunity to present additional evidence on the merits of this matter. By Order of December 28, 1973, the Court granted defendants this opportunity, amending the previous Order to be preliminary in effect. After oral argument the Court gave the government further time to submit additional evidence. While admitting in a later pleading that the Court's previous decision was "reasonably based upon the factual record as it appeared at the time of the motion for preliminary injunction,"[3] defendants argue 'that the Court's finding is "insupportable when considered in the light of the additional

---

1. The Court extensively examined the background of this controversy in the Memorandum of December 5, 1973, (hereinafter referred to as Memorandum), and therefore the Court will not further discuss the intricacies of the Social Security Act vis-a-vis the regulations at issue in this case or the matters raised in defendants' motion to dismiss. To the extent that those issues are again raised by the government in relation to this rehearing, the findings and conclusions expressed by the Court in the December 5, 1973, Memorandum are once again adopted by the Court.

2. *See* Memorandum at 3–7. Under these programs, the nursing homes are essentially to be reimbursed for their expenses under a "reasonable cost" formula. The controls available in determining reasonable cost, whether administered with success or not, were set up by Congress to assure no nursing home would receive unwarranted reimbursement from the government. For a discussion of these controls, see Memorandum at 4–5.

3. Memorandum of the Government with Attached Supplemental Submission of Evidence, January 14, 1974, at 1.

information submitted since that decision." [4]

At this time, therefore, the Court is called upon to consider defendants' additional submissions and to decide whether a permanent injunction shall issue.[5]

### I.

The heart of this controversy, and the essence of plaintiff's case, is the conflict between the cost reimbursement scheme devised by Congress under Titles XVIII and XIX of the Social Security Act and both the old and new Cost of Living Council regulations which would withhold this "reasonable cost" reimbursement provided by Congress if that reimbursement would increase the average realized revenues per diem over the 6.5 percent ceiling mandated by the COLC. In the Memorandum of December 5, 1973, the Court held that these regulations could not overrule the intent of Congress to provide reasonable reimbursement with all the attendant controls such as careful audit which Congress provided. The government's additional information has not convinced the Court that its prior holding was erroneous.

Plaintiff, citing Perry v. Commerce Loan Co., 383 U.S. 392, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966), and United States v. American Trucking Associations, Inc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), argues that there is no more persuasive evidence as to the intent of Congress to provide reasonable cost reimbursement without interference from the COLC than the plain language of the statute. Additionally, plaintiff contends that when the statute expresses this Congressional intent in reasonably clear, plain language, the common meaning of the words used must be accepted. Hudson Distributors, Inc. v. Eli Lilly & Co., 377 U.S. 386, 84 S.Ct. 1273, 12 L. Ed.2d 394 (1964). Thus, plaintiff asks the Court to simply read the Medicare and Medicaid provisions of the Social Security Act [6] and determine that Congress intended reasonable cost reimbursement thus preventing the Cost of Living Council from promulgating these challenged regulations.

It is true that the language of these statutes is clear. However, it is the emergency nature of the Economic Stabilization Act of 1970 that demands that this Court look further to determine if in fact it intended its own statutory programs to be negated by an agency endowed with great power As noted previously by this Court,[7] the Cost of Living Council should be given great deference by any court due to the enormous burden and the emergency nature of its tasks.[8]

The first direction in which the Court must look in determining Congressional intent is the language of the Economic

---

4. *Id.*

5. During the course of this proceeding, a stay was issued by the Temporary Emergency Court of Appeals (D.C. 21, T.E.C.A.) on January 11, 1974, until this rehearing could be held on January 21, 1974. In the interim, the defendants issued new regulations, 6 C.F.R. §§ 150.769–150.787. Although these new regulations differ somewhat from the regulations previously under consideration, the essential legal questions remain. Under 6 C.F.R. § 150.773, a 6.5 percent ceiling on permissible annual increases in average realized revenues is implemented. In addition, the definition of "price" continues to include Medicare and Medicaid payments; thus nursing homes are still prohibited from receiving any reimbursement, provided by the Social Security Act, which would increase average realized revenues per diem over the 6.5 percent ceiling. Plaintiff has, with leave of the Court, accordingly amended its complaint to include a challenge to these regulations which were sent to the Federal Register on January 16, 1974, and are effective as of January 1, 1974. Therefore, this Memorandum is also addressed, when applicable, to the January 16, 1974, regulations.

6. For the language of these sections, see Memorandum at 3 n. 2.

7. Memorandum at 11.

8. United States v. Lieb, 462 F.2d 1161, 1166 (Em.App.1972).

Stabilization Act itself. Under Section 203(j) of that Act, Congress provided that:

> Nothing in this title may be construed to authorize or require the withholding or reservation of any obligational authority provided by law or by any funds appropriated under such authority.

Although this section would apply more directly to a clear impoundment fact situation, it is convincing evidence of Congressional intent that funds appropriated for specific programs should not be withheld without a clear Congressional directive. This language of § 203(j) is applicable by analogy to the question at bar where, in fact, the Economic Stabilization Act is being used as a rationale to withhold from federal programs monies intended to be expended in what Congress believed was a rational and prudent manner.

The government can present as persuasive evidence only the language of Congressman Wilbur Mills of the House Ways and Means Committee in furtherance of its contention that Congress intended the COLC to control nursing home price levels without regard to the "reasonable cost" reimbursement scheme already statutorily mandated. A brief explanation of the context of Mr. Mills' remarks is necessary.

Section 225 of Public Law 92–603, enacted in 1970, placed a five percent limitation on the annual increases in nursing home costs which would be reimbursed by the government under the Medicaid program.[9] However, this provision was repealed by the 93rd Congress under Public Law 93–66, 1973 U.S.Code and Administrative News, p. 1799. It was in the context of this repeal that Congressman Mills, the House Manager of the repeal bill, stated:

> The final medicaid provision in the Senate amendment would delete a provision in present law which limits the average per diem costs for skilled nursing facilities and intermediate care facilities to no more than 5 percent a year. The wage-price guidelines which apply to such institutions already perform the type of function intended by this provision will no doubt continue to do so for some time. The Department of Health, Education and Welfare estimates that there will be no cost of this provision if the wage-price controls are kept in effect. For these reasons the conferees recommend adoption of this provision. Cong.Rec. June 30, 1973, H. 5790.

■ From these remarks, the government urges this Court to determine that Congress intended its reasonable cost reimbursement scheme take a second place to COLC regulations. The Court cannot accept this reasoning for two reasons. First, it is not clear that Representative Mills, if faced with the choice of COLC regulation or the continuance of the reasonable cost reimbursement scheme already enacted would choose, after careful consideration, that COLC regulation was the better road to follow. This remark was simply not considered in the regulation versus statute context with which this Court is

---

9. The bill implementing this ceiling was passed in the House. H.R.Rep. 92–231, 92d Cong., 1st Sess. 308 (1971), U.S.Code Cong. & Admin.News 1972, p. 4989. However, the Senate rejected the ceiling. The Senate Report stated:

> The committee believes that Section 225 is inconsistent with an upgrading of care in facilities which may result in additional costs for the facility. The provision would be difficult to administer and inequitable in that it does not take into account many uncontrollable expenses and places and arbitrary limit, unrelated to services rendered, on payments to a facility. Furthermore, the Professional Standards Review provision approved by the committee should assure proper utilization of long-term care facilities, and overtime should serve to effectively control costs for these services.

S.Rep.No.92–1230, 92nd Cong., 2d Sess. 324 (1972). Nevertheless, the provision was restored in Conference. H. Conference Rep. No.92–1605, 92d Cong. 2d Sess., 16 (1972). However, as noted in the text, the subsequent Congress repealed this provision.

concerned. Secondly, the remarks of one Congressman are not sufficient evidence, when viewed in the context of all the other evidence, to determine that Congress decided to allow reasonable cost reimbursement to be, in effect, replaced by COLC regulation.

The other evidence that appears very relevant to the Court and has equal weight with the remarks of Representative Mills is the statement of Senator Williams, the Senate sponsor of this same bill repealing the five percent ceiling of Section 225 (S.1837). Senator Williams, arguing for repeal, offered the following rationale for his position:

> First, the provision of the Social Security Act in question, Section 1903(j), applies only to nursing homes. It does not apply to hospitals which have essentially similar costs as far as supplies, food, and personnel.

> Second, this section of the law seems to contradict Section 1902(a)(13) subsection (E), which requires the States to establish cost related reimbursement for medicaid nursing homes by July 1, 1976.

> Third, there is no consideration given to increases in rates which will be required to meet new and higher federally imposed standards incorporated in H.R. 1 last year.

> Finally, there is no concession in the present 5 percent ceiling for inflation generally or specifically for the increases in costs of supplies, materials, food, and personnel.

> On this last point, we should note that the general rate of inflation in the United States is presently about 6 percent a year while medical and health costs have been increasing twice as fast. The lack of controls on suppliers is also significant—particularly since food costs for providers will probably jump 13 to 20 percent this year.

> I would also like to emphasize that there are abundant cost controls in the present law to protect against unreasonable increases in nursing home rates. Among these are Utilization Review, Professional Standards Review, Organizations and Medical Review. Moreover, the Cost of Living Council controls the rates nursing homes can charge to private patients.

> All of these are compelling arguments for the repeal of Section 1903(j). But most important of all from my judgment is the fact that this provision effectively limits the quality of care provided to patients under the medicaid program. It has been acknowledged by most students in long-term care that medicaid rates are too low and that this is one of the primary causes for the reports of low quality of care received by indigent nursing home patients. In H.R. 1, last year the Congress made a commitment to increase these rates to a reasonable level, at least to reflect cost minimums. I intend to see that we keep our promise. The present provision is clearly arbitrary and discriminatory and patently unfair. For all these reasons and for the sake of the thousands of elderly who must spend their remaining days in a long-term care facility, we must repeal Section 1903(j).

119 Cong.Rec. 9217–18 (May 16, 1973).

Senator Williams' remarks clearly show his view that not only was this five percent limitation discriminatory but that no consideration in a five percent ceiling was given to the increases in rates which will be required to meet the new federally imposed nursing home standards and to maintain a high level of care. This is the precise argument raised by plaintiff in his contention that Congress did not intend the COLC to withhold money under reasonable cost reimbursement which was needed to maintain the level of care Congress felt necessary. Additionally, it is clearly the Senator's view that there were already sufficient controls in determining reasonable costs to "protect against unreasonable increases in nursing home

rates" [10] without either this 5 percent Congressional limitation and, by analogy, the 6 or 6.5 percent COLC limitation. It is also significant that in paragraph six of the above-quoted remarks Senator Williams states: "Moreover, the Cost of Living Council controls the rates nursing homes can charge to private patients." It can reasonably be assumed that Senator Williams did not believe the COLC would be controlling the rates charged public patients under Medicare and Medicaid since these programs were already under the "reasonable cost" controls inherent in Titles XVIII and XIX and COLC controls would only be applicable to private paying patients. It appears quite clear, therefore, that Senator Williams and Congressman Mills held different views of the same repeal bill. Accordingly, the Court must look further to determine Congressional intent.

■ There is another reason why this Court is constrained to hold that agency regulations in conflict with Congressional authorization set forth in Titles XVIII and XIX of the Social Security Act must fail. In P.L. 92–603, 92d Cong., H.R. 1, October 30, 1972, Congress enacted Section 249 (42 U.S.C. § 1396a(a)(13)(E)), which requires states by July 1, 1976, to reimburse skilled nursing and intermediate care facilities on a reasonable cost related basis under Medicaid. Up to this time under Title XIX, the exact amount and method of reimbursement was to be established by the state, subject only to a ceiling imposed by 42 U.S.C. § 1396a(a)(30), which provides that a state plan must make provision to ensure that payments for medical care and services "are not in excess of reasonable charges consistent with efficiency, economy, and quality of care." The Senate Report on this section, S.Rep.No.92–1230, 92d Cong., 2d Sess. (1972) sets forth the reasons for extension of this cost related reimbursement to Medicaid at 287:

Under the medicare program extended care facilities are reimbursed for the reasonable costs they incur in providing covered services plus, in the case of proprietary institutions, an allowance related to net capital equity. Under medicaid States have been free to develop their own bases for reimbursement to skilled nursing facilities and intermediate care facilities. States generally establish (in advance) per diem or similar basic rates payable for patients receiving skilled nursing facility and ICF care. Concern has been expressed that some skilled nursing facilities and ICF's are being overpaid by medicaid, while others are being paid too little to support the quality of care that medicaid patients are expected to need and receive.

On the other hand the reasonable cost reimbursement approach of the medicare program has in many cases created difficulties for extended care facilities. The detailed and expensive cost-finding requirements can prove cumbersome.

The committee bill would require States to reimburse skilled nursing and intermediate care facilities on a reasonable cost-related basis by July 1, 1974. This approach is preferable to the arbitrary rate-setting currently in effect in some States which provide no incentive to facilities to upgrade the level of care provided.

Thus, it is clear that Congress did not give up the reasonable cost formula due to what the government argues is poor administration. Congress has added new vitality to the concept by extending its applicability to the States.

It appears clear that against all this evidence of Congressional intent to carry out the reasonable cost reimbursement scheme as directed by statute, the government side of the scale contains essentially only the remark of Representative Mills.[11] For these reasons, and the

10. See Memorandum at 14–15.

11. The government, it must be said, has submitted an additional argument based on

reasons previously expressed in the December 5, 1973, Memorandum, this Court again, upon consideration of the government's additional evidence, must permanently enjoin the COLC from interfering with or limiting the amount of cost reimbursement which nursing homes are entitled to receive for services rendered under the Medicare and Medicaid programs.

## II.

The second issue which this Court must address is whether the government regulations [12] are so lacking in a rational basis as to warrant the Court adjudging them arbitrary and capricious. Pacific Coast Meat Jobbers Ass'n v. Cost of Living Council, 481 F.2d 1388 (Em. App.1973); Western States Meat Packers Association v. Dunlop, 482 F.2d 1401 (Em.App.1972).

■ The determination of whether these regulations are arbitrary and capricious must rest upon a careful examination of the record as presented to this Court. Due to the importance of the

Cost of Living Council's task in controlling inflation, this Court is very reluctant to enjoin this regulatory scheme. The Cost of Living Council has no obligation to prove beyond a reasonable doubt that there is a rational basis for every regulation promulgated; such a burden of proof would result in an unconscionable and unmanageable burden on the agency. However, the COLC must be able to show, and refute evidence to the contrary, that they are not acting on a conclusory basis unsupported by fact that an industry is inflationary. The agency does have an obligation to establish that it has a rational basis to support its position that the industry is inflationary. Unfortunately, in the case of the nursing home industry, the government has had difficulties in providing information that would illustrate a rational basis for these regulations. The government, in its pleadings, has noted that:

A problem throughout this case has been the dearth of reliable statistics as to the inflation in the nursing home industry, as contrasted with the

McGuire Shaft and Tunnel Corporation v. Local Union No. 1791, U.M.W., 475 F.2d 1209 (Em.App.1973). This case centered around the grant of preliminary injunctions against labor unions enjoining the violation of arbitration provisions of collective bargaining agreements through strikes by the union to force pay increases already disapproved by the Pay Board. These actions appeared to be in conflict with the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. However, the Temporary Emergency Court of Appeals, in an opinion by Judge Estes, found that the clear language of Section 210(a) of the Economic Stabilization Act allowed such a suit. Section 210(a) provides:

Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject· to the limitations of Section 211), and/or damages.

This fact situation is easily distinguishable from the principal case in that in the latter

case there is no such provision in the Economic Stabilization Act showing Congressional intent to allow action notwithstanding the provisions of another statute; all this Court can consider is the regulation standing alone and Representative Mills' remarks in the context of the repeal of a related statute. Moreover, Section 209 of the Economic Stabilization Act, as considered in *McGuire Shaft*, provided that the district court could "issue mandatory injunctions commanding *any person* to comply with any . . . order or regulation" under the act. "Any person" was interpreted by the Court to clearly include unions. McGuire Shaft and Tunnel Corporation v. Local Union No. 1791, U.M.W., 475 F.2d at 1214. Again, we have no such language in the case at bar that would illustrate such clear Congressional intent to amend by interpretation a previous law. In fact, the intent as embodied in legislative history shows quite the contrary.

12. The Court will consider both the 1971 regulations, 6 C.F.R. § 300.18, and the 1974 regulations, 6 C.F.R § 150.769–787, in determining whether there is sufficient evidence in the record to establish a rational basis for these regulations.

health services industry, particularly hospitals, as a whole.[13]

To provide the defendants with every opportunity to present reliable evidence, this Court has twice allowed the government to supplement the original record. After careful review of all the additional evidence the Court finds that the government has failed to show a rational basis for these regulations and, therefore, this Court can only find there is substantial reason to adjudge them arbitrary and capricious. Without entering into detailed analysis of every submission of evidence, the Court feels it appropriate to outline briefly by way of illustration portions of the record on this point. This is not to say the Court has relied solely on this evidence in what has become a voluminous record, but these are matters that should be noted.

In this Court's Memorandum of December 5, 1973, the Court quoted from a paper entitled "Memorandum for Members of the Ad Hoc Committee from Executive Director, Health," dated August 21, 1973. The government now argues that this position paper did not on August 21, 1973, and does not now, represent the position of the COLC or any member of its staff. Moreover, the government contends that paper reflects much data submitted to defendants by the plaintiff prior to the institution of this suit, including information from a Research and Statistics Note published by the Department of Health, Education, and Welfare showing an actual decrease in the national cost of nursing home care between 1970 and 1972.

It appears upon review of this option paper that parts in fact were COLC staff conclusions based not only on plaintiff's data but data from the office of Research and Statistics of the Social Security Administration and the Department of Commerce. The paper concluded from this independent data that:

An examination of the above table would seem to indicate that the net effect to date of the Economic Stabilization Program on this sector of the health industry has been to severely retard its rate of growth. If nursing home care is viewed as a less expensive alternative to acute care institutionalization, and is, therefore, to be encouraged, the impact of the Economic Stabilization on this sector thus far would appear to be deleterious.

Also, significantly, John Twiname, Director of Health of the COLC, reported at the October 17, 1973, Health Industry Advisory Meeting that, after a consideration of this option paper and the data therein, "that the prevailing view of the Ad Hoc Committee [was] that nursing homes be decontrolled by the Cost of Living Council."[14]

Even assuming, *arguendo*, that this option paper should not be regarded as conclusive as to the minimal inflationary impact of the nursing home industry, it is clear, based on the record in its entirety, that this Court can find no reliable evidence to conclude that there was a rational basis for these regulations. As pointed out by plaintiff in its Memorandum in Opposition to Defendants' Supplemental Submission of Evidence, much of the evidence relied on by the government is irrelevant due to its age or based on incomplete evaluation. Furthermore, many of the statements by Mr. Twiname in his affidavit of January 14, 1974, are conclusory and without adequate support in the record. In regard to the government's data, it is worthy to note that many of the increases in Medicaid, attributable by the government to inflation, can be explained by the realization of the states that the rates were simply inadequate and in all fairness should be raised.[15]

In conclusion, the Court must again point out that its decision is based solely

13. COLC Memorandum with Attached Supplemental Submission of Evidence, January 14, 1974, at 2.

14. Exhibit A to Plaintiff's Opposition to Defendant's Motion for Stay and Reconsidera-

tion, or in the Alternative, for Stay Pending Appeal, December 19, 1973, at 2.

15. *See* Plaintiff's Response to Affidavit of John D. Twiname dated January 14, 1974, at 4, Appendix A to Plaintiff's Memorandum in

on the review of the record presented. The record does not reveal the rational basis required for the support of these COLC regulations. The COLC has an obligation to act on reliable data and as pointed out by the Temporary Emergency Court of Appeals in Chrysler Corporation v. Dunlop, 490 F.2d 985 (1973):

> While we adhere to the basic tenet that the expertise of COLC is to be given great weight in questions of interpretation of its own regulations, see University of Southern California v. Cost of Living Council, 472 F.2d 1065, 1068–1069 (Em.App.1972), this is not a carte blanche.

490 F.2d at 988.

It is the determination of this Court, therefore, that these regulations cannot stand in light of their direct contradiction of Congressional intent and authorization as reflected in the Medicaid and Medicare programs and for the further reason that no rational basis has been established for their support.

Opposition to Defendant's Supplemental Submission of Evidence; *see generally* Affidavit of Robert J. Myers in Support of

Plaintiff's Motion for Preliminary Injunction; remarks of Senator Williams, *supra,* at 8.